# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

### No. 18-839V

Filed: October 31, 2022

```
* * * * * * * * * * * * * * * *      *
MARY MICELI,                         *      UNPUBLISHED
                                     *
            Petitioner,              *
v.                                   *      Findings of Fact; Onset; Influenza ("Flu")
                                     *      Vaccine; Shoulder Injury Related to
SECRETARY OF HEALTH                  *      Vaccine Administration ("SIRVA").
AND HUMAN SERVICES,                  *
                                     *
            Respondent.              *
                                     *
                                     *
                                     *
* * * * * * * * * * * * * * * *      *
```

*Laura Levenberg, Esq.*, Muller Brazil, LLP, Dresher, PA, for petitioner.
*Emilie Williams, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

### RULING ON ONSET[1]

**Roth**, Special Master:

On June 13, 2018, Mary Miceli ("petitioner" or "Ms. Miceli") filed a petition pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 *et seq.*[2] ("Vaccine Act" or "the Program"). Petitioner alleges that she developed a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccination she received on October 28, 2016. Petition at 1, ECF No. 1.

For the reasons discussed below, I find the onset of petitioner's left arm/shoulder pain was in March of 2017.

---

[1] Although this Ruling has been formally designated "unpublished," it will nevertheless be posted on the Court of Federal Claims's website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Ruling will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.      Procedural History

The petition, petitioner's affidavit, witness affidavits, and medical records were filed on June 13, 2018. Petition, Petitioner's Exhibits ("Pet. Ex.") 1-12, ECF No. 1.

Following an initial status conference on August 2, 2018, petitioner was ordered to file her primary care medical records for three years prior to vaccination, transcriptions of illegible handwritten medical records, and an amended Statement of Completion. Scheduling Order, ECF No. 8. Petitioner filed the requested records on September 28, 2018, October 4, 2018, April 12, 2019, and May 15, 2019. Pet. Ex. 13-17, ECF Nos. 9, 11, 19, 20.

Respondent filed his Rule 4(c) Report ("Resp. Rpt.") on June 7, 2019, recommending against compensation. ECF No. 21. Respondent submitted that petitioner's claim did not satisfy the criteria for an on-Table SIRVA injury. Resp. Rpt. at 6. Respondent pointed to the contemporaneous medical records documenting that petitioner's shoulder pain "developed gradually sometime after vaccination and was only significant enough to report nearly six months post-vaccination." *Id*. Respondent added that between the subject vaccination and the first report of shoulder pain, petitioner attended "more than a dozen medical visits for orthopedic pain at which shoulder pain was not mentioned." *Id*. at 6-7. Additionally, "petitioner had a preexisting history of diffuse osteoarthritis that could explain her symptoms." *Id*. at 7. An MRI eight months after vaccination "revealed many changes unrelated to an inflammatory reaction from vaccination, including osteoarthritis." *Id*. Finally, petitioner's first report of shoulder pain was six months after vaccination in the context of litigation and a concurrent worker's compensation claim, which was denied. *Id*. at 9.

This matter was reassigned to me on June 25, 2019, and a status conference was held on August 14, 2019. ECF No. 24. Following the status conference, an Order was issued for the filing of petitioner's worker's compensation denial information and transcriptions of illegible handwritten medical records from the doctors who authored the records. It was learned at that status conference that the transcriptions previously filed had been done by a member of petitioner's counsel's office staff.  The parties were also ordered to provide a mutually agreeable time for an onset hearing. Scheduling Order, ECF No. 25. Petitioner filed the requested exhibits on August 27, 2019, September 23, 2019, September 26, 2019, and October 9, 2019. Pet. Ex. 18-21, ECF Nos. 31-34. The parties agreed to an onset hearing on June 18, 2020. Joint Status Report, ECF No. 26.

The onset hearing was ultimately held on September 10, 2020 via WebEx videoconference due to the COVID-19 pandemic. Scheduling Order, ECF No. 38; Status Rpt., ECF No. 39.

Following the hearing, an Order issued for petitioner to file additional information. ECF No. 43. Petitioner filed the ordered records on September 24, 2020, along with a Statement of Completion. Pet. Ex. 22-27, ECF No. 44-45. Respondent filed a Status Report on October 26, 2020 advising he was satisfied that the record was complete. ECF No. 48

The matter is now ripe for a Ruling on Onset.

## II.    The Factual Record

### A.    Petitioner's Medical Records

#### 1.    Petitioner's Pre-Vaccine Medical History

Petitioner's medical care was/is received at Northwell Health/Staten Island University Health ("Northwell Health"), where she is a licensed clinical social worker ("LCSW") in the psychology/psychiatry department. *See generally* Pet. Ex. 2. Her past medical history includes hypertension, gastritis, osteoporosis, uterine cancer in 2010, arthritis, diverticulosis,[3] hiatal hernia, and Barrett's esophagus.[4] Pet. Ex. 17 at 6. Petitioner took anti-inflammatories daily for osteoarthritis,[5] and received handicapped parking privileges for disability due to her osteoarthritis interfering with her ability to walk. Pet. Ex. 2 at 4, 6, 30, 32, 54.

Petitioner treated with Dr. Resnick, a podiatrist, for many years for issues with her feet including degenerative joint disease and pain, bursectomy, hammertoes, and metatarsophalangeal joint pain ("MJP") that required her to wear sneakers, orthotics, and a right ankle brace. Pet. Ex. 15 at 8-12. Petitioner visited Dr. Resnick[6] on a regular basis. *See generally* Pet. Ex. 4; Pet. Ex. 15; Pet. Ex. 20.

Further, petitioner suffers from degenerative disc disease with spondylolisthesis[7] at L4-5 and lower lumbar facet arthrosis; bilateral hip osteoarthritis with chondrocalcinosis[8] suggestive of underlying calcium pyrophosphate deposition ("CPPD") arthropathy; and bilateral tricompartmental osteoarthritis with meniscal chondrocalcinosis of the knee suggestive of underlying CPPD arthropathy. Pet. Ex. 7 at 18-19. She complained of bilateral hand pain due to bilateral radiocarpal basal joint and second metacarpophalangeal ("MCP") joint osteoarthritis with associated chondrocalcinosis. *Id.* at 21. She was under the care of Dr. Sanders, a rheumatologist, in 2014 for worsening joint pain in her hips, knees, and feet without joint swelling. Pet. Ex. 17 at 6.  She treated with an orthopedist for osteoarthritis of her knee and meniscal tears and received Synvisc injections. She complained of low back pain radiating into her legs and occasional hand pain. She had morning stiffness. *Id.* at 6.

---

[3] Diverticulosis is the presence of diverticula, particularly of colonic diverticula, in the absence of inflammation. *Dorland's Illustrated Medical Dictionary* 552 (33rd ed. 2019) [hereinafter "*Dorland's*"].

[4] Barrett's esophagus is "a peptic ulcer of the lower esophagus, often with stricture, due to the presence of columnar-lined epithelium in the esophagus". *Dorland's* 1792.

[5] Osteoarthritis is a "noninflammatory degenerative joint disease . . . characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane." *Dorland's* 1326.

[6] Dr. Resnick's records were illegible, and petitioner was ordered to have the records transcribed. *See* Pet. Ex. 4. In response to the Order, petitioner filed what purported to be a transcription of her medical records. However, it was later learned that the transcription had been prepared by a staff member in petitioner's counsel's office. *See* Pet. Ex. 15. Petitioner was ordered to file a transcription prepared by Dr. Resnick. All references to Dr. Resnick's records will be cited using Exhibit 20, transcriptions prepared by Dr. Resnick. Pet. Ex. 20.

[7] Spondylolisthesis is the "forward displacement of one vertebra over another . . . usually due to a developmental defect in the pars interarticularis." *Dorland's* 1725.

[8] Chondrocalcinosis is "the presence of calcium salts, especially calcium pyrophosphate, in the cartilaginous structures of one or more joints." *Dorland's* 346.

Petitioner received her annual flu vaccine on October 15, 2014 without event. Pet. Ex. 2 at 7.

X-rays on December 3, 2014 of petitioner's hands, pelvis, knees and lumbar spine revealed osteoarthritis with associated chondrocalcinosis and possible underlying CPPD arthropathy in most of those areas. Pet. Ex. 6 at 18-21; Pet. Ex. 8 at 16-19.

Dr. Sanders's assessment following the foregoing x-rays was "osteoarthritis likely cause of symptoms." Pet. Ex. 17 at 11. Ibuprofen and physical therapy were ordered for her back, knee, and hip pain. *Id.* He administered Synvisc injections to petitioner's left knee on April 25, 2015 and petitioner's right knee on May 2, 2015. *Id.* at 16, 18.

Petitioner continued to have joint pain with swelling in both knees and Dr. Sanders suspected a pseudogout attack on May 19, 2015. A Medrol dosepak and ibuprofen were prescribed. Pet. Ex. 17 at 19, 21. Physical therapy was ordered *Id.*

On July 7, 2015, petitioner presented to Dr. Sherman, an orthopedist with whom she had previously treated for knee and hip pain, complaining of bilateral knee pain and left hip pain with increasing discomfort since May. Imaging revealed degenerative disease in all compartments of both knees and the impression was osteoarthritis of the knees and hips. Anti-inflammatories were recommended. Pet. Ex. 21 at 10;[9] *see also* Pet. Ex. 3, Pet. Ex. 14.

At a routine visit on September 19, 2015, Dr. Resnick documented, "Complains of AM pain 1st metatarso-phalangeal joint (hallux abducto valgus) bilaterally. Recommend stretching exercises for 1st metatarso-phalangeal joint. Emollient cream dispensed for feet.... Hallux abducto valgus, +metatarsalgia. Continue orthopedic shoes and orthotics. Return 2 month." Pet. Ex. 20 at 9.

Petitioner received her annual flu vaccine on October 6, 2015 without event. Pet. Ex. 2 at 9.

Petitioner returned to Dr. Resnick on November 21, 2015 complaining that her "feet hurt all over." Pet. Ex. 20 at 9. Her regular visits with Dr. Resnick continued in 2016 with pain in the balls of her feet and arthritis. It was recommended she wear thicker-soled sneakers and orthotics. *Id* at 8.

At a primary care visit with Dr. Kelly on February 15, 2016, petitioner reported aching joint pain, "located diffusely," which was "gradual in onset and ongoing." Her "biggest problem" was her inability to walk. Pet. Ex. 6 at 28. She previously had x-rays which revealed osteoarthritic changes in her hips, knees, back and feet. She had Synvisc injections and developed gout. *Id.* Dr. Kelly advised to "keep muscles strong with non-weight bearing exercises." *Id.* at 31.

At her April 2, 2016 visit, Dr. Resnick wrote, "suffers from painful osteoarthritis in feet & other areas of her body for which she takes an anti-inflammatory daily & follows up with a

---

[9] Dr. Sherman's records were transcribed in similar fashion to Dr. Resnick. Therefore, references will be made to Exhibit 21, the transcription performed by Dr. Sherman. Pet. Ex. 21.

rheumatologist. She also wears orthotics in her sneakers to alleviate painful ambulation, foot & bunion pain, midfoot & ankle pain & metatarsalgia." Pet. Ex. 20 at 6.  She has left knee and bilateral foot pain with pain everywhere she touched. *Id.* at 8. Petitioner was to follow up with Dr. Sanders and return in three months. *Id.*

Petitioner presented to Dr. Sanders on April 2, 2016 with worsening pain in the left knee with walking, and hip and lower back pain. Pet. Ex. 17 at 22. A DepoMedrol[10] with lidocaine injection was given in her left knee. *Id.* at 24. Petitioner requested repeat x-rays of her hips and lumbar spine to assess progression from her last examination. Colcyrs was considered for petitioner's possible pseudogout attacks. *Id.* at 24.  X-rays revealed multi-level severe degenerative disc disease of the lumbar spine with endpoint spondylosis at L2-3, moderate degenerative changes at L4-5 and L5-S1 with bilateral moderate L5-S1 facet arthrosis, and bilateral moderate facet arthrosis at L1-2 and L2-3. Pet. Ex. 7 at 15. Her osteoarthritis of the hip remained unchanged, with L4-5 grade 1 spondylolisthesis with chronic bilateral L5 pars breakage. *Id.* at 14-15.

Petitioner underwent an esophagogastroduodenoscopy with findings of esophagitis, Barrett's esophagus, hiatus hernia, and gastritis in April 2016. Pet. Ex. 6 at 10. An MRI of the abdomen for dilated pancreatic duct in July 2016 revealed stable mild pancreatic ductal dilation measuring 3/5 mm since a 2009 MRI. Pet. Ex. 8 at 9.

At an August 2016 visit with Dr. Resnick, petitioner reported that her feet "hurt so much just with regular walking." Pet. Ex. 20 at 8.

### 2.   Petitioner's Receipt of the Influenza Vaccine

Petitioner received the subject flu vaccine in her left arm on October 28, 2016 at Northwell Health while at work. Pet. Ex. 1 at 1.

### 3.   Petitioner's Post-Vaccine Medical History

At a November 5, 2016 visit, Dr. Resnick opined, "Treadmill may have triggered pain (2-3-4x/week). Chief complaint: Right arch and heel pain Discontinue treadmill." Pet. Ex. 20 at 7. Physical therapy was prescribed twice a week for 4 weeks with ultrasound of the right heel, soft tissue massage and mobilization, ice, and a home exercise program. An injection was administered in her right heel. The diagnosis was heel spur syndrome with plantar fasciitis in the right foot. Petitioner was told to return in two weeks *Id.* at 8.

Petitioner returned to Dr. Resnick on November 19, 2016, who wrote, "Did treadmill despite my recommendation not to. "50%" better and didn't do physical therapy." Pet. Ex. 20 at 7. The diagnosis remained the same and petitioner was told to avoid the treadmill, attend physical therapy, and return in three weeks. *Id.*

Petitioner presented to Richmond Rehabilitation on November 23, 2016 for physical therapy evaluation and treatment of her right foot. She reported pain of 9/10 to the right lateral

---

[10] DepoMedrol is a trademark name for preparations of methylprednisolone acetate, which is an anti-inflammatory. *Dorland's* 486, 1138.

foot, plantar fascia band, and heel. Pet. Ex. 5 at 3. She attended physical therapy for her right foot November 28, 2016, December 3, 2016, December 8, 2016, and December 12, 2016. Pet. Ex. 5 at 2.

Petitioner returned to Dr. Resnick on December 10, 2016 reporting that her right heel was worse despite physical therapy. Pet. Ex. 20 at 7. Stretching exercises were reviewed and petitioner was told to rest and return in two weeks. A non-contrast MRI was ordered to rule out a tear. *Id.* The assessment was "worsening plantar fasciitis right foot with pain greater than 2 months, unresponsive to conservative treatments." *Id.*

An MRI of the right foot performed on December 14, 2016 revealed a tear and stress response in the plantar fascia, severe central mid-foot osteoarthritis, and chronic compression of the medial plantar nerve. There was also mild medial flexor tenosynovitis with medial flexor retinacular sprain. Pet. Ex. 6 at 22-23; Pet Ex. 8 at 7-8. Upon receipt of the MRI results, Dr. Resnick requested that petitioner come into the office for a Cam walker (boot). Pet. Ex. 20 at 6. She wrote a note for petitioner to be excused from work on December 13-16, 2016 due to her plantar fascia tear; she also wrote a Letter of Medical Necessity for a below the knee Cam walker to immobilize petitioner's right plantar fascia during limited ambulation. *Id.* at 6-7.

On January 7, 2017, Dr. Resnick wrote, "Patient fell on [the] floor using Cam walker, so [she is] not using it. Admonished for not telling me sooner. Wearing 'Heel that Pain' inserts." Pet. Ex. 20 at 6. Petitioner reported feeling "75-80%" better with minimal pain noted on palpation. She was advised to continue with rest, wear sneakers, use inserts and return in a month. *Id.*

Petitioner returned to Dr. Resnick on February 4, 2017 and reported being "90-95%" better. She was "markedly improved" and happy with her progress. Pet. Ex. 20 at 5. *Id.* She continued to have generalized pain in both feet and was advised to continue wearing orthotics, sneakers, and to follow up with a rheumatologist. *Id.*

Petitioner's handicapped parking pass was approved on February 7, 2017. Pet. Ex. 2 at 12.

Dr. Resnick wrote a letter dated February 11, 2017 excusing petitioner from work on "Thursday 2/9 & Friday 2/10/17 due to right foot pain and trouble walking in ice weather." Pet. Ex. 20 at 5. By March 11, 2017, petitioner's plantar fasciitis was improved. Pet. Ex. 20 at 5.

Petitioner presented to Northwell Health for her annual physical on April 10, 2017. On the "Annual Employment/Service Health Assessment" form petitioner reported "arm injury since flu vaccine Oct '16." Pet. Ex. 2 at 58. The examination record documents that petitioner reported receipt of a flu vaccine in October 2016 with worsening shoulder pain and believed the flu vaccine was the cause. She had not sought any medical care but filled out a VAERS report that she planned on submitting it. She was advised to report to the Office of Human Services (OHS) to fill out proper paperwork. *Id.* at 13. Petitioner was escorted to OHS. *Id.*

A worker's compensation medical visit with Dr. Sherman was scheduled for April 18, 2017.[11] A "Doctor's Initial Report, State of New York – Workers' Compensation Board" C-4 report was filled out documenting an injury after flu shot at the hospital on October 28, 2016 with a diagnosis of "Impingement syndrome of the left shoulder." Pet. Ex. 3 at 8, 10. Subjective complaints included pain, stiffness, and weakness. *Id.* at 10. Prognosis was "good", and she was assessed with 25% temporary impairment. *Id.* at 11. There was no missed time from work or assistive devices prescribed. *Id.* at 12.

In his report, Dr. Sherman documented a 74-year-old with left shoulder pain since a flu shot given at work; pain was worse with activities with some pain at night and overhead activity. Physical examination revealed forward flexion of 170 degrees and abduction of 170 degrees. She lacked one spinal level of internal rotation. She had 60 degrees of external rotation, positive impingement sign, no AC joint tenderness, no instability, and 5/5 strength in all planes. The impression was "Right (sic) shoulder impingement syndrome." Pet. Ex. 3 at 14. The plan was physical therapy, Mobic 7.5 mg per day, a return visit in six weeks, and possible subacromial injection if symptoms persist. *Id.* at 14; Pet. Ex. 21 at 7.

By email correspondence dated April 26, 2017 petitioner was advised her worker's compensation claim was "going to be denied." Pet. Ex. 2 at 20.

At her May 6, 2017 visit with Dr. Resnick, petitioner reported that she had a flu shot reaction and saw Dr. Sherman. She also complained of generalized pain in both feet and her toes. Pet. Ex. 20 at 5.

Petitioner returned to Dr. Sherman on June 6, 2017 with continued discomfort of her left shoulder, though somewhat better. She refused subacromial injection and was treated with Mobic. Pet. Ex. 21 at 8.

Petitioner presented for physical therapy evaluation and treatment on May 16, 2017. On May 18, 2017, she reported left shoulder pain of 9/10. Her passive range of motion ("PROM") on abduction was now greatly reduced at 102 degrees. Pet. Ex. 5 at 4, 6. On May 22, 2017, she reported "clicking" of the left shoulder. *Id.* at 4. On May 27, 2017, she reported pain radiating from the left shoulder into the upper arm and hand with positive impingement sign. *Id.* On June 1, 2017, she reported pain to the lateral shoulder with pain on palpation of the deltoid tuberosity. *Id.* On June 5, 2017, she reported shoulder pain of 7/10 with range of motion on abduction of 104 degrees. *Id.* On June 10, 2017, she reported "clicking" of the left shoulder. On June 12, 2017, she reported pain radiating from the left shoulder into the upper arm and hand. Pet. Ex. 5 at 4. On June 19, 2017, she reported lateral shoulder pain, with pain on palpation of the deltoid tuberosity, and on June 26, 2017, she reported difficulty dressing secondary to pain and decreased range of motion. Her active range of motion ("AROM") of the left shoulder flexion was 125 degrees with pain. *Id.* at 5.

---

[11] Petitioner was treated by Dr. Sherman in the past, as discussed in the section on petitioner' pre-vaccine medical history. *See generally* Pet. Ex. 21.

At her June 16, 2017 visit with Dr. Sherman, petitioner reported discomfort but refused an injection and was prescribed Meloxicam[12] for three weeks. Pet. Ex. 14 at 2.[13]

Petitioner presented to Dr. Kelly on June 26, 2017 for hypertension and years of diffuse aching joint pain. She complained of aching left shoulder pain at the glenohumeral joint,[14] gradual in onset which moderately limited her activities. She worked full time. She saw Dr. Resnick for her feet, Dr. Sherman for her shoulder, Dr. Sanders for rheumatology, and Dr. Kalman for colitis and gastritis. She was unable to sleep on her left side due to shoulder pain since her flu shot. The record noted, "Left shoulder has been getting worse, did have an xray at ortho." Pet. Ex. 6 at 25. She complained of fatigue, hypertension, gastroesophageal reflux, arthralgias, osteoporosis, and anxiety. *Id*. On examination, she had tenderness of the glenohumeral joint, acromioclavicular joint[15], and at the bicipital groove. There was crepitus[16] and pain with abduction and adduction of the left shoulder. *Id*. at 27.

Dr. Resnick's note on July 1, 2017 includes, "Patient states she suffers from pain often." Pet. Ex. 20 at 5.

An MRI of the left shoulder performed on July 5, 2017 revealed complete full thickness supraspinatus tendon[17] tear with proximal tendon retraction to the level of the acromioclavicular joint with mild fatty replacement muscle; full thickness tear of the anterior two thirds of the infraspinatus[18] with proximal tendon retraction to the level of the acromion; high grade partial thickness articular sided tear of the posterior third of the infraspinatus; and subscapularis[19] tendinosis[20] with superior articular sided fibers fraying. Pet. Ex. 8 at 5. The findings were consistent with subacute/chronic Hill-Sachs impaction fracture[21] deformity and bony Bankart Lesion.[22] There was large glenohumeral joint effusion/synovitis[23] with free communication to the

---

[12] Meloxicam is a nonsteroidal anti-inflammatory drug used in the treatment of osteoarthritis". *Dorland's* 1111.

[13] Pet. Ex. 14 indicates that the record is 18 pages, though only two pages are filed.

[14] The glenohumeral joint is the joint of the glenoid cavity and the humerus. The glenoid cavity is "a depression in the lateral angle of the scapula for articulation with the humerus." The humerus is the long bone of the arm that articulates with the scapula at the shoulder and with the radius and ulna at the elbow. *Dorland's* 775, 729, 863.

[15] The acromioclavicular joint is the "articulation between the acromion and the clavicle." The acromion is "the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder." *Dorland's* 20.

[16] Crepitus is the grating sensation caused by the rubbing together of the dry synovial surfaces of joints". *Dorland's* 424.

[17] The supraspinatus is a muscle that runs from the supraspinous fossa of the scapula to the greater tubercle of the humerus and abducts the humerus. *Dorland's* 1195.

[18] The infraspinatus is a muscle that runs from the infraspinous fossa of the scapula to the greater tubercle of the humerus and rotates the humerus laterally. *Dorland's* 1189.

[19] The subscapularis is a muscle that runs from the subscapular fossa of the scapula to the lesser tubercle of the humerus and rotates the humerus medially. *Dorland's* 1194.

[20] Tendinosis refers to any pathologic condition of a tendon. *Dorland's* 1852.

[21] A Hill-Sachs lesion is a "compression fracture of the posteromedial humeral head, sometimes occurring with anterior dislocation of the shoulder, caused by impaction of the humeral head on the anterior rim of the glenoid fossa." *Dorland's* 1012.

[22] A Bankart lesion is the avulsion of the anterior glenoid labrum following anterior dislocation of the shoulder. *Dorland's* 1011.

[23] Effusion is the escape of fluid into a part or tissue. Synovitis is "inflammation of a synovial membrane; it is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within in synovial sac." *Dorland's* 589, 1826.

subacromial bursa[24] via the full thickness rotator cuff tears and acromioclavicular joint osteoarthritis. The findings were suggestive of a near full-thickness avulsion tear[25] of the long head of the biceps from the glenoid insertion with proximal tendon retraction into the mid- to distal arm. *Id*.

Petitioner presented to Dr. Sherman on July 19, 2017. Pet. Ex. 21 at 6. She was attending physical therapy but had increasing discomfort and was taking Mobic.[26] She suffered from right hand problems that interfered with her life. She had 170 degrees of forward flexion, internal rotation lacked three levels with 5/5 strength, and her external rotation was 60 degrees with 4/5 strength. She had positive impingement sign and crepitation. Dr. Sherman's impression was "irreparable rotator cuff tear." An injection was administered.  Pet Ex. 21 at 6.

Petitioner's physical therapy records in July and August 2017 documented difficulty washing her back secondary to shoulder pain with decreased range of motion and internal rotation of the iliac crest region on July 24, 2017; left shoulder pain at 5/10 with AROM and abduction of 130 degrees on July 31, 2017; difficulty dressing secondary to shoulder pain and decreased ROM on August 7, 2017; continued intermittent clicking on August 16, 2017; intermittent clicking on August 21, 2017; and pain radiating from the left shoulder into the upper arm and hand with left bicep strength of 3+/5 on August 28, 2017. Pet. Ex. 5 at 5.

Petitioner reported doing better at her visit with Dr. Sherman on August 16, 2017 and was "quite happy." She had full range of motion: 180 degrees abduction and full internal rotation, and 45 degrees external rotation with 4/5 strength. She was to continue rotator cuff scapular training and consider arthroscopy with debridement if her symptoms worsened. Pet. Ex. 21 at 5; Pet. Ex. 14 at 1-2; Pet. Ex. 3 at 5.

Petitioner continued her regular visits with Dr. Resnick. Pet. Ex. 20 at 5. On November 1, 2017, she reported to Northwell Health that Dr. Sherman thought she had impingement/ bursitis of the left shoulder. Pet. Ex. 2 at 18.

Three months later, on February 17, 2018, petitioner presented to Dr. Sanders with worsening knee pain, giving way, and feeling unstable. She had difficulty walking long distances and had pain in her shoulder and feet. She had no further pseudogout attacks since her last visit. Pet. Ex. 17 at 25. Musculoskeletal examination revealed full range of motion with no pain in her neck, shoulders, elbows, ankles, or feet. Her back, hands, wrists, hips, and knees were painful with tenderness and/or swelling. *Id*. at 26. A DepoMedrol and lidocaine injection was administered to her right knee. *Id*. The assessment was diffuse osteoarthritis. *Id*. at 27.

Petitioner returned to Dr. Sherman on May 16, 2018 with increasing shoulder pain for several months. She noticed noises in her shoulder. On examination, she had positive impingement, forward flexion of 180, abduction of 180 with 4/5 strength, and internal rotation lacked two spinal levels with 5/5 strength. External rotation was 30 degrees with 3/5 strength. Dr.

---

[24] The subacromial bursa is "a bursa located between the acromion and the insertion of the supraspinatus muscle, extending between the deltoid and the greater tubercle of the humerus". *Dorland's* 259.

[25] Avulsion is the ripping or tearing away of a part either accidentally or surgically. *Dorland's* 181.

[26] Mobic is a trademark name for meloxicam. *Dorland's* 1154; *see* note 11.

Sherman's impression was left shoulder rotator cuff insufficiency. A subacromial injection given. Pet. Ex. 21 at 9.

On June 30, 2018, petitioner returned to Dr. Sanders for a DepoMedrol and lidocaine injection in the left knee. Pet. Ex. 17 at 29.

Dr. Resnick wrote a letter to petitioner's counsel dated September 9, 2019, confirming that she provided routine foot care to petitioner every two months since June 19, 2010. She wrote that petitioner suffered from plantar fasciitis of the right foot and a tear of the plantar fascia on December 14, 2016, which fully resolved. Petitioner also had periodic bouts of left and right bunion pain since 2013 and 2016, respectively. Pet. Ex. 20 at 3. Petitioner wears supportive arch inserts for metatarsalgia and to prevent recurrence of plantar fasciitis and foot pain. Pet. Ex. 20 at 3.

No further medical records were filed.

**B.    Affidavits, and Testimony of the Petitioner and Witnesses**

**1.    Affidavit and Testimony of Petitioner, Mary Miceli**

Ms. Miceli affirmed receipt of the subject influenza vaccination at work on October 28, 2016. Pet. Ex. 9 at 1. She submitted that the moment the shot made contact, it felt different than in years past: it felt weird, like something was in the way, like resistance. *Id*. She was sore that day and worse the next but dismissed it as temporary. *Id*.

Ms. Miceli affirmed being "incapacitated due to plantar fasciitis and had severe pain and difficulty walking," and ignored her arm pain until February or March 2017, when her foot pain subsided. Pet. Ex. 9 at 1. Then, "sometime in March, the shoulder pain was so severe that I was unable to drive with my left arm and had trouble dressing. I could not carry anything without the help of my right hand/arm." *Id*.

Ms. Miceli saw an orthopedic, who sent her for physical therapy which "afforded only minimal help." Pet. Ex. 9 at 1. At her yearly physical with her PCP, she requested an MRI of her shoulder. *Id*. After the MRI, the orthopedic gave her a shot that afforded "more relief". *Id*. She continues to suffer limited function of that arm. *Id*. at 2.

At hearing, petitioner stated that she is employed by Northwell Health as an LCSW and works 37.5 hours per week. She also works five hours per week in her private practice. Her work schedule was the same in October 2016. Tr. 32-33. She had no prior injury to her left arm. Tr. 33.

Petitioner discussed her relationship with her co-workers who submitted affidavits and offered testimony at hearing. She does not speak with Ms. Somma on a regular basis, and they are only work friends, though she spoke to her "weeks ago. Months ago maybe" when Ms. Somma called her needing to get in touch with counsel. Petitioner works with Colleen (Ms. Cannatelli) every day, they only discuss patients, not her case and are not friends outside of work. She stated that she sent a text to Mr. Sinclair a few weeks ago to thank him for participating in her case. She

was shocked he was still involved. They did not discuss the substance of his testimony. Tr. 100-02.

Petitioner stated that she would discuss her health issues with her co-workers, particularly her knees, and believed most of them would remember her having trouble with her knees for the past 10 to 12 years. Tr. 102-03. She probably discussed her arm/shoulder injury since it was "the main thorn at that time." Tr. 122. However, she stated that her arm pain was not her primary complaint between October 2016 and May 2017: "[m]y plantar fasciitis was my primary complaint until it started to subside, which was whenever the record shows." Tr. 122. Petitioner could not recall which foot was affected, "I think it was the right foot. I think." Tr. 123.

Petitioner stated that she was in good health prior to 2016. Tr. 35. She had osteoarthritis in her knees which really impaired her ability to walk upstairs and long distances when it first developed, but after physical therapy, lifestyle changes, and exercise she was able to push through it. Tr. 35, 37-38. She has arthritis in her feet and had surgery for her right toe prior to 2000. Tr. 36. At age 22, she sustained an injury to her right hand which resulted in severe disability affecting her fine motor skills. She is right-hand dominant, types with one finger, and taught herself to write by changing how she holds the pen. Tr. 38-39, 105.

Petitioner stated that her left shoulder injury interfered with work duties, which require her to carry charts through heavy doors to and from the file room. She had to use a "wheelie cart" to carry more than one or two charts at a time. Before her shoulder injury, she carried 7-8 charts depending on how heavy the charts were. None of her physical conditions affected her work prior to her vaccine injury. Tr. 33-35, 107, 123. Petitioner then stated that prior to her shoulder injury, she was unable to pull files out of tight places with her right hand but would lift a file with her left hand then put the file under her right arm. Tr. 105-06, 109. She was also unable to turn knobs with her right hand, so she would turn the knob with her left hand, release the door, and push the door open with her right side. Tr. 106-08. Her left hand, arm, and shoulder were her "go to part of her body." Tr. 38. Now, she protects her left side because she does not want to reinjure anything. She supports her left arm with her right arm due to weakness. Tr. 108.

Petitioner submitted that prior to October 2016, her co-workers may have helped her pull files because of her right-hand injury. Tr. 109. She then stated she did not discuss her right-hand injury with anyone at work, "I don't make announcements about these things." Tr. 110. She stated she has had a handicapped parking spot for the last 10 to 12 years due to osteoarthritis, a torn meniscus in her knee, and issues with her feet. Tr. 34, 103-04.

Petitioner stated that at age 22, she was out on disability for six weeks when she injured her right hand but did not take any sick leave for her plantar fasciitis or vaccine injury in 2016; she only stays home for a heavy snowstorm. She never allowed her health conditions to keep her home from work. Tr. 110-11.

Petitioner stated that on October 28, 2016, she went to Employee Health for her mandated flu vaccine. Both she and the administrator were standing when the vaccine was administered, but "as soon as the needle hit the area of the arm, I said, that didn't – that didn't feel right"; the "injection did not feel like other years. It felt like something was in the way. It felt like it wasn't

piercing properly." Tr. 42. She did not recall where on her arm the vaccine was administered or if there was pain on administration, only that "it did not feel right", and "pretty much immediately, a few minutes, maybe a half hour, an hour after I went over to work, I remember holding it and telling people that it didn't – it felt different, it didn't feel right, and it was sore." Tr. 43. She "probably" told people at work "right away" that the vaccine did not feel right because they are a "pretty tight group, so we do talk about things." Tr. 44. She then stated she only recalled mentioning something to the administrator of the vaccine, who told her to put ice on it, "[a]nd when I went—then I walked right across the street to where I work from Employee Health. And did I mention it? Probably. Said it didn't feel right and it's sore and et cetera, et cetera." Tr. 45.

Petitioner then conceded she had no specific recollection of the day of the vaccine or whether she had difficulty that day because it was four years ago. She recalled people offering to help her with charts but was unsure when that was. Tr. 46. She did not recall having pain over the weekend. She did not recall discussing arm pain on the day of the vaccine or the Monday after with any of her co-workers. Tr. 124.

Petitioner believed her left shoulder pain developed before the plantar fasciitis because she went to the gym and used the treadmill more because it did not involve using her left arm. Tr. 36-37. She agreed she had approximately eight visits with Dr. Resnick between November 5, 2016 and March 11, 2017 for plantar fasciitis. Tr. 51. She stated she usually sees Dr. Resnick every two months for her feet, but during that timeframe her plantar fasciitis was "horrible, because it was very severe and it wouldn't go away," and walking was very painful. Tr. 52. An MRI confirmed a tear in the plantar fascia and Dr. Resnick prescribed a boot to restrict movement, which petitioner wore for a while but stopped because she couldn't drive with it and did not think it was helping much. Tr. 36, 53. She did not recall how often she wore the boot to work, but she did recall people at work asking what was wrong. Tr. 111.

Contrary to Dr. Resnick's record, petitioner denied falling while using the boot. She stated the boot made her leg weak, and "I almost fell, but I didn't" and "I caught myself." Tr. 60-62. Petitioner denied injury to her left shoulder when she caught herself, adding, "Well, that was during the very, very severe plantar fasciitis. It may have been prior to the fact of the [left shoulder] injury worsening to the point where I was starting to take really notice and concern about it. So I really don't recall that." Tr. 111-112.

Petitioner had "no answer for" why she attended 13 medical visits including physical therapy between October 28, 2016 and April 10, 2017 but never reported any shoulder pain during this five-and-a-half-month period. Tr. 53-55, 115. She may have mentioned it but assumes she did not since there is no medical record of it. Tr. 116. When asked why Dr. Resnick's records document a shoulder injury reported at her May 6, 2017 visit, she stated, "...the fact that I was dealing with Muller Brazil in, I think it was April or May, I thought she should be aware that her records would be subpoenaed... I told her what was going on." Tr. 54-55. "I believe I called them [Muller Brazil] in March or April and I was told to wait until my appointment with Dr. Sherman...which was April – sometime at the end of April, April 18th or so". Tr. 55-56.[27]

---

[27] Petitioner was cautioned at this point not to discuss any conversations she may have had with counsel. Tr. 56.

Petitioner was asked what prompted her to contact an attorney before receiving any medical care for her shoulder injury. Tr. 56. She stated,

> …When it became very severe, which was the turn of the year, maybe February or so, I wondered why I was continuing to have severe pain and why it was getting worse instead of better and why now I was having the pain and the restriction of driving and it was very, very painful. So of course, I decided to do some research. It was suggested to me by some person that do you think it had to do with that flu shot that you were complaining about. So I said, I don't know. So I Googled, I looked up, I researched arm/shoulder injury, flu vaccine, and a whole bunch of stuff come up. All of the symptoms that I had gave—gave a description of what may have happened and then there were—there was an ad for an attorney there so—and then I decided that it was time to take care of this because it wasn't going away.

Tr. 56-57, 112-15. Petitioner learned of the vaccine program in February or March through her research and that she would not have to sue the hospital where she worked. Tr. 69-70, 113-14. She then stated the pain started the day of the flu shot, never went away and she believed the flu shot was the cause. Tr. 112-13. She could not recall if she called the attorney or doctor first, "I don't think I had contacted an attorney when I went to Northwell, but I may have. I don't remember. But I know that I was scheduled with – already scheduled with Dr. Sherman for April 18th." Tr. 58, 114.[28] Petitioner's counsel reminded petitioner that she had submitted an intake form to the law firm on April 21, 2017. Tr. 70.[29]

Petitioner stated during the five and a half months after her flu vaccine, treatment for the plantar fasciitis was "certainly uppermost because it was very severe and it lasted a long time and I've never had it like that." She was more concerned about being able to walk, drive, and get around than about "something, which I still thought was a flu shot reaction, but didn't pay much attention to it…but it was always there still, that left arm pain." She used ice and ibuprofen to treat the pain. Tr. 68-69, 72. Petitioner stated she knew someone who had pain for two months after a vaccine before it finally went away, but when it became really bad she researched it and realized there was an issue and she had to go to the doctor. Tr. 69.

Petitioner stated she presented to Employee Health on April 10, 2017 for her annual health assessment, not for her shoulder. Tr. 71-72. Someone told her to report her arm pain to the hospital, so she reported that she had a "reaction to the flu shot, still a sore arm, very painful" at that appointment. She also asked for a report of her flu vaccine because she knew she would need proof of vaccination. Tr. 73-74; Pet. Ex. 1. When the manager at Employee Health gave her the proof of vaccination, she was told to go to Occupational Health to fill out a report. Tr. 75. She was escorted to an administrative assistant at Occupational Health who took down information and told her to make an appointment with the nurse practitioner to give a statement. She met with the nurse practitioner on April 12, 2017. Tr. 79. She then made an appointment with Dr. Sherman, who

---

[28] The appointment with Dr. Sherman was made after she visited Occupational Health and reported her arm injury on April 10, 2017.

[29] Petitioner's submission of an online intake form does not answer the question of when she first contacted counsel. She testified to calling the attorney and being told to see the doctor first, suggesting that she contacted an attorney prior to seeing any physician for her shoulder injury and prior to April 10, 2017.

treated her previously for her knees, because he also did worker's compensation cases. Tr. 80-82. She was told by Occupational Health that she had to file for worker's compensation, which she did, but the claim was denied. She added she was not going to go wherever they wanted her to go for the hearing "in view of all the pain that I had," and did not want to "deal with all the red tape," so she told them to close the case. Tr. 120-22.

Petitioner stated that she downloaded a VAERS report and filled it out but did not know what to do with it. Tr. 75-76; Pet. Ex. 18 at 2. She later found it in her "drive" with "everything she had compiled" and gave it to Muller Brazil. They filed it for her. Tr. 76-77.  She then received a phone call from someone at the vaccine adverse reporting system asking her some questions. Tr. 77, 119-120. Petitioner confirmed the VAERS report filed in this case is the one she gave to counsel. Tr. 78.

 Petitioner stated when she presented to Dr. Sherman on April 18, 2017, it was a different experience from when she had treated with him before.[30] He did not take her seriously, refused to order an MRI, and only did an x-ray and an examination. Tr. 82-84. She stated moving her arm to the side was and still is restricted, but she had no trouble moving her arm out to the front or lifting it up. Tr. 83. If she holds both arms out to the side, the right goes back further than the left, a problem she did not have before the vaccine. Tr. 85-86.  Dr. Sherman did not pay attention to her or that she was "in such severe pain." She claims that his record of "almost full range of motion" is not accurate. Tr. 86-87.

Petitioner pointed to the area above her elbow but below her shoulder as the location of her pain, with pain moving up to the shoulder. Tr. 89. She then admitted that she could not recall if her pain was in the upper arm or shoulder, "[a]ll I remember is my – I couldn't move my arm without pain. I'm not sure exactly the locality of the pain because it was – it was quite diffuse." Tr. 95. She denied having pain between her wrist and elbow, but the pain in her upper arm was radiating and "horrible." Tr. 119. She currently has weakness when lifting something, but no pain. Tr. 89.

Petitioner stated that her PCP, Dr. Kelly, ordered the MRI when she described how bad her pain was. Tr. 82. She described the MRI in July 2017 as very painful, and that it aggravated her arm to the point that she had to "recover" before she could drive home. Tr. 90-91. Petitioner again pointed to the area between her elbow and shoulder as the location of her pain but stated, "you know this was four years ago. I remember the entire upper arm was very, very irritated. So I'm not saying that it was a specific pain in a specific part, and that's the only thing that I can tell you without making something up, is the entire upper arm was extremely irritated and weak." Tr. 92-93. Petitioner said she did not know what a deltoid muscle was, adding "I have no memory specifics of what muscle was hurting." Even after her counsel described the anatomy of the shoulder to petitioner, she could not answer or recall where her pain was. Tr. 94.

Petitioner stated Dr. Sherman discussed and tried to explain the MRI result to her. She knows she has a ruptured bicep but does not know if that is the cause of her weakness. Tr. 89-90; Pet. Ex. 21 at 6. She then stated she "probably did not understand all of the issues that he was – all of the parts of the body that he was referring to. He was using medical language and I don't recall

---

[30] Petitioner had seen Dr. Sherman in July 2015 for her knees. *See* Pet. Ex. 3 at 15-18; Pet. Ex. 21 at 10.

specifically…he explained everything in detail, and he said that whatever was torn was retracted…it couldn't be pulled back by surgery." Tr. 95-96. Petitioner did not recall being told about a "massive tear of the rotator cuff." Tr. 96; Pet. Ex. 21 at 6. She "read the MRI" and felt her pain was "validated or vindicated." Tr 96. She did not recall being told that she had dislocated her shoulder in the past but believes she would have remembered if she did. Tr. 118.

Petitioner stated that she attended 16 physical therapy sessions for her left shoulder between May 16, 2017 and August 28, 2017. Tr. 87; Pet. Ex. 5 at 4-6. At that point in time she was in the "throes of pain"; the therapy was "painful" and "irritating" to her shoulder and did not improve the pain. Tr. 88. She could not remember if it helped her range of motion. Tr. 88. She did not return to physical therapy after the 16 sessions but was taught home exercises and given some tips to compensate for and protect the arm, which helped. Tr. 88-89. She was given a band to work with at home and at the beginning, she did as many of the exercises as she could at home. Tr. 89. When asked later about the home exercises she was given by the physical therapist, she stated she was taught to use a weight and bands for strength and mobility. She uses the weight two to three times week but has not used the band in a long time. Tr. 116-17. After two and a half years, the pain has subsided. Tr. 118.

Petitioner described the onset of her shoulder injury. She stated it "…was a gradual thing… It was within a couple of months – well actually, I had the distraction of the plantar fasciitis pain. So I didn't pay much attention to what I couldn't do with my left hand, but I know that the charts and the opening of doors were biggies – were the biggies, and the driving started to be impossible around February... Because the shoulder got very severe then." Tr. 47-49. At the "end of January beginning of February the severity increased terribly…" and "…around February or March, it was severely restricting my activities." Prior to that time, it was minimally restrictive. "[A]s spring started to approach, I started to take notice, I started to be alarmed that this pain is not going away."  Tr. 50, 58-59. The pain became very severe, and "[t]he severity did not happen gradually…It worsened over, I don't know, a short period of time to become alarming to me." Tr. 59. The severe uptick in the shoulder pain prompted medical care. Tr. 126-127.

Petitioner conceded that her severe pain was from March through July. She was unable to drive with that hand but still drove and was unable to dress herself but figured it out so she could get to work. Tr. 62. Petitioner did not recall anything happening in that timeframe that could have injured her arm. Tr. 62-63.

When her counsel tried to redirect her regarding when "her pain started", petitioner stated:

[R]ight after the flu shot, I had soreness. I didn't know if it was a reaction to the flu shot. So the weakness started maybe within a few days. The soreness continued and got more sore. I didn't pay much attention to it…But the weakness was – the weakness and the soreness was there…almost from the beginning, yeah.

Tr. 65. She then stated, "maybe that day, the next day, that week", she realized something was wrong because the weakness was starting. The soreness and weakness gradually progressed to lack of mobility and severe pain months later. Tr. 67.

When asked again about her charts at work, petitioner now said she previously carried her charts one or two at time to and from the file room. Tr. 63.  People helped as they would for anyone in distress, but she would rarely ask for help unless she had to bend over to get a chart from a bottom drawer and lift it up. Tr. 64. Ms. Somma helped, she was very concerned and probably helped if she could, but she was very busy. Tr. 64. Petitioner stated she was given a "wheelie", because lifting the charts became a big issue. Tr. 50. She later stated she just received the cart within the past year, when a new manager who was very compassionate started in January, saw her struggling, and got the cart for her. Tr. 125-26.

Petitioner conceded her co-workers helped before October 2016 because of her right-hand injury but when her left arm/shoulder pain became severe, her co-workers, especially Colleen, probably helped more because she would ask, or they saw her struggling. Tr. 127.

Petitioner was asked if she complained to her co-workers more about her foot pain between November and January. It was mentioned to her that her co-workers referred to her shoulder pain as so "debilitating" she could not drive and was asked when exactly that occurred. Petitioner stated, "Oh, I couldn't drive – well because of my foot maybe. I don't know what they were talking about or what anyone means when they say I complained about being very debilitated. I know that at – that I got the flu shot. So they knew that I was in pain with the arm. I never complained it being (sic) so severe in October and November, I don't think." Tr. 128-130. She added, "I don't know the progression, but I know that I started to take more notice of it" after the end of the year. Petitioner stated that she had soreness when lifting the arm, so it wasn't easy to drive, but she "never didn't drive because of it." Tr. 131. Further, "[T]he word 'debilitating,' I was not debilitated from the arm right after the flu shot. I was just in soreness and weakness." Tr. 131. She conceded she was never in enough pain or concerned enough about the vaccine injury to call a doctor until some point in February or March; though people were concerned and told her to report it or go to the doctor from the beginning, she didn't. Tr. 131-32.

On redirect, petitioner could not recall when she started to have difficulty driving or with other tasks. At first, she stated she had pain and weakness in her arm after the flu shot, then stated it was soreness and weakness but not pain, and "the weakness in my hand prevented me from lifting the arm up to drive…but I could drive." Tr. 133-134. Petitioner conceded that she had no recollection of when she began having difficulty driving, only that she had pain and weakness from the beginning and her co-workers helped her to carry charts and open doors. Tr. 134.

## 2.  Affidavit and Testimony of Petitioner's Co-Worker, Susan Somma

Ms. Somma is a clerk at the ambulatory care clinic where petitioner is a therapist. She has known petitioner for about five years but does not see her outside of work. Tr. 5; Pet. Ex. 12 at 1.

She recalled petitioner coming to the front desk on October 28, 2016 to say she was leaving to get her flu shot and complaining of pain in her arm and shoulder when she returned. Tr. 6; Pet.

Ex. 12 at 1. She recalled that when petitioner returned to work on Monday, she was worse. She held her arm close to her body, said she could not dress herself, had trouble driving, and did not have full range of motion in her shoulder. She was unable to carry her charts, lift the charts, return the charts to the right place, or open file drawers or doors. Ms. Somma believes she told petitioner to report her injury on that day. Ms. Somma helped carry and file her charts at times. Pet. Ex. 12 at 1-2.; Tr. 9, 11-12, 19.

Ms. Somma recalled that petitioner had "a problem with her foot at the same time and it was causing her a lot of stress because she had both issues and it was really affecting her work and just life in general." Pet. Ex. 12 at 2; Tr. 16-17, 20-21. Ms. Somma did not recall petitioner ever complaining of shoulder pain or difficulty using her shoulder prior to October 2016. Tr. 6, 18. Ms. Somma did not recall petitioner's shoulder pain getting worse at any point. Tr. 20-21.

Ms. Somma explained that everyone would take their charts for the day from the file room when they arrived, but petitioner was visibly in pain, so everyone helped her get her charts and open doors. Tr. 9-11. After a while, it became routine for petitioner to drop off her files and for others to file them. Tr. 14. Ms. Somma could not recall for how long she helped petitioner with her charts. Tr. 12-14. She later stated she continued to help petitioner until Ms. Somma went out on sick leave in September 2019. Tr. 18-19. Ms. Somma does not know how petitioner is now. Tr. 13.

Ms. Somma receives the phone calls in the morning when someone calls out sick and reports it to the supervisors. She recalled petitioner calling out "a bit and I called her patients quite a bit" but did not recall when that was or if it was after the vaccine. Tr. 24-25.

Ms. Somma knew petitioner had a handicapped parking spot and that petitioner had trouble driving due to her shoulder, but she did not know if that was why she had a parking spot. Tr. 26.

Ms. Somma described petitioner's job as a therapist as sitting with a patient and doing notes, stating it did not involve major physical activities other than carrying the charts. Tr. 27-28.

### 3.  Affidavit and Testimony of Petitioner's Co-Worker, Craig Sinclair

Mr. Sinclair is a LCSW like petitioner and works at the same facility. Pet. Ex. 10 at 1. He has known petitioner since he started work at the hospital in 2015. They are not social outside of work. Tr. 136-137. Mr. Sinclair affirmed that flu vaccines are required at work. *Id.*

Mr. Sinclair recalled speaking with petitioner on October 31, 2016 "in regard to pain she was suffering immediately after receiving the vaccine." Pet. Ex. 10 at 1. He knows it was Halloween 2016 because his son turned six a few days before and they discussed trick or treating. Tr. 153, 156-57. He recalled they were in the chart room and petitioner was taking charts out of the drawer, favoring her left arm with a grimace on her face. He asked what was going on. Tr. 139. Petitioner said she had left shoulder pain and did not know why other than receiving a flu shot. She stated she had limited range of motion and was having difficulty doing regular household chores, opening doors, and driving. She asked him for help with her charts. Tr. 138-140. He believes she had received the vaccine a few days or a week prior. Tr. 139-140; Pet. Ex. 10 at 1.

Mr. Sinclair stated thereafter he periodically helped petitioner with charts when he saw her in the chart room and other co-workers did as well. He recalled she sometimes used a chair to wheel her charts to her office and had difficulty opening doors, so he helped her. Tr. 141-42. He then stated "maybe a week later, three days later" after Halloween 2016, she started using a cart for her charts because she was struggling and there wasn't always someone around to help. Asking for help was not her style. Tr. 144-45; 154.

Mr. Sinclair affirmed that "[S]he complained for at least 6 months of shoulder pain with no improvement and I assisted her during this time with charts." Pet. Ex. 10 at 2; Tr. 142-43. He did not recall if her shoulder pain increased or worsened, only that "she was still experiencing discomfort." He may have suggested she seek treatment, but he was not 100 percent sure. Tr. 142-43.

Mr. Sinclair did not recall petitioner having difficulty with or complaining of any left shoulder pain, issues with her lower extremities or any other injuries prior to October 2016. He added however that conversations were brief because the office is very busy. Tr. 137, 142, 147, 149-150. He never helped with her charts before October 2016, so it stood out to him when she needed help. Tr. 147. Mr. Sinclair did not recall petitioner's shoulder pain getting worse at any time but believes it was constant. Tr. 149. Between October 2016 and his transfer to another unit in 2018, he was not aware of petitioner having arthritis or any injury to her right hand or knees. When specifically asked, he stated she may have discussed her feet, but that was after her shoulder injury and she did not complain of pain, she was just "kind of walking a little bit slower than she normally would". Tr. 148. When asked about whether she wore a boot, he then recalled a boot but did not recall when or for how long she wore it, but believed it was after October 2016. Tr. 154-55, 157.

Mr. Sinclair inferred that petitioner's shoulder pain was from the flu vaccine because he knows from the internet that vaccines have side effects and petitioner is a fit lady who never had difficulty lifting and carrying charts or doing anything for herself and never complained of pain to him, so he "put two and two together." Tr. 137-38, 140, 153. He added that another co-worker lost hearing in her ear after a flu vaccine years ago. Tr. 140-41. He stated that he and petitioner arrived at the conclusion together that her arm pain was from the vaccine since it was the only thing that had happened out of the ordinary. Tr. 146.

Mr. Sinclair was asked why he used the phrase that petitioner "complained of shoulder pain for at least six months with no improvement". He stated, "that's when I remember it distinctly." Tr. 151. He could not recall when he asked to participate in this case and whether it was in 2017, 2018, or 2019 but recalled signing his affidavit in 2018. Tr. 151-52. He denied being provided with anything to refresh his recollection of timeframes, stating he alone provided the information in his affidavit. Tr. 152. Mr. Sinclair stated that he typed his own affidavit, but when asked if the document was still on his computer, stated he has had two computers since then. Tr. 156. He did not recall how he sent the affidavit to counsel, whether by email or fax. Tr. 156. He did not recall receiving the typed statement back from counsel in affidavit form, but confirmed the affidavit was accurate and sounded like the way he speaks and writes. Tr. 158; *see* Pet. Ex. 10.

Mr. Sinclair did not recall when he last spoke to petitioner about her arm since his transfer to a different unit in 2018, but it was probably in August 2018 and she still complained of pain then. He is unaware of her getting worse at any point in time and did not know if she got better. Tr. 143-44, 155, 159-160. Mr. Sinclair was asked why, if he continued to assist petitioner until he left in August 2018, he used the six-month timeframe in his affidavit. He was "unsure". Tr. 159.

Mr. Sinclair stated that petitioner sent him a text a few weeks before the hearing to thank him for testifying. Tr. 143.

### 4. Affidavit and Testimony of Petitioner's Co-Worker, Colleen Cannatelli

Ms. Cannatelli is a nurse and petitioner's co-worker. Pet. Ex. 11 at 1. She met petitioner when she started working in the clinic in 2009. Tr. 161-62, 179. Ms. Cannatelli did not recall petitioner complaining of any issues or difficulty with her arm or shoulder before October 2016. Tr. 162. She recalled petitioner wearing a boot around that time, but "[i]t was before" October 2016. Tr. 162-63. Ms. Cannatelli did not recall petitioner complaining about arthritis, knee pain, or any other injuries between 2009 and October 2016. Tr. 162.

Ms. Cannatelli all the staff see each other in the chart room at the clinic and that is where she spoke to petitioner on the afternoon of Friday, October 28, 2016. She recalled the year because 2016 was a bad year for her and the date just "stuck in [her] mind." Tr. 163-64. She saw petitioner before and after she went for her flu shot. Petitioner complained of pain in her left arm immediately after receiving the injection. Ms. Cannatelli recalled thinking at least she has the weekend to recover from any side effects she may have. Tr. 164. As a registered nurse who administers vaccines, Ms. Cannatelli knows some people suffer from "a little cold or a little temperature" or soreness or redness at the vaccine site. She has heard of people being injured by vaccines. Tr. 165. She recalled petitioner cupping her right hand over her left arm stating, "immediately when she received the flu shot, her arm hurt." Tr. 166-67. Ms. Cannatelli recalled thinking the location petitioner was holding was a little high compared to where the vaccine should have been given— typically two finger lengths down from the end of the shoulder—but because petitioner has something wrong with her right hand, she wasn't sure if she was using it as a frame of reference or if that was where the vaccine was given. Tr. 167-68. Ms. Cannatelli did not know the specifics of petitioner's right-hand deformity, only that it limited her motion and impacted her ability to put charts away as she relied more on her left hand to do so. Tr. 168, 180. Ms. Cannatelli stated that because of petitioner's right-hand deformity, she assisted petitioner on occasion prior to October 2016 if a chart was in the bottom drawer or too high, but otherwise she was fine on her own. She never struggled with her left arm prior to October 2016. Tr. 168-69, 177, 180.

Ms. Cannatelli affirmed after petitioner returned from getting her shot, she asked her to move her arm. Petitioner could barely raise her arm above her waist and was guarding the arm. Seeking to protect her fellow nurse, Ms. Cannatelli told petitioner some discomfort at the injection site was expected. Pet. Ex. 11 at 1. However, Ms. Cannatelli was concerned about petitioner over the weekend and was surprised on Monday when petitioner was worse. Pet. Ex. 11 at 1-2. She recalled speaking to petitioner on Monday in the chart room and her not feeling any better. Tr. 173. Petitioner did not "have range of motion in her left hand to help her with – to get the charts out." Tr. 169.

Ms. Cannatelli initially thought petitioner had a local reaction to the flu shot, but days became weeks and she observed petitioner having difficulty getting and returning charts and being frustrated about being unable to do things for herself. Pet. 11 at 2. According to Ms. Cannatelli, she urged petitioner to go to the doctor because she was concerned with how the injury was interfering with petitioner's ability to take care of herself. She recalled thinking to herself that it was almost Thanksgiving and how would petitioner lift a turkey from the oven. Pet. Ex. 11 at 2. She stated that both she and petitioner believed the vaccine caused petitioner's left arm pain. Tr. 170-71, 179.

Ms. Cannatelli told petitioner to file an incident report a week or two after the vaccination, about the same time she told her to see a doctor. Tr. 171-72. Initially, Ms. Cannatelli stated that petitioner saw a doctor and brought in reports and scans but could not remember when that occurred. Tr. 171. She then "vaguely" remembered petitioner going to the doctor around Thanksgiving because she was getting worse. Tr. 174. Ms. Cannatelli then stated she asked if petitioner went to the doctor, but petitioner said no, so she just left it alone because they are only co-workers. Tr. 183-84. Ms. Cannatelli was unaware that petitioner did not see a doctor until April 2017. Tr. 186.

Ms. Cannatelli stated that between October 2016 and 2017, she saw petitioner daily but only spoke to her about twice a week. Tr. 174. The conversations were brief until she started to go to the doctor, though Ms. Cannatelli could not recall when that was. Tr. 175. Ms. Cannatelli did not recall petitioner mentioning an onset of significantly worsening pain which prompted her to see a doctor. Tr. 186.

The only other health issue Ms. Cannatelli was aware of besides petitioner's shoulder was "some fasciitis or something like that" of her foot which preexisted the flu shot but was still happening simultaneously with the shoulder pain. Tr. 172-73. She did not know if petitioner missed time from work because of her foot but she did recall petitioner wearing a boot every time she saw her and stopping the boot around the time of the flu vaccine. Tr. 173, 181-82. Ms. Cannatelli later stated petitioner wore the boot before and after the flu vaccine. Tr. 187-88. Ms. Cannatelli did not recall petitioner having any significant difficulties walking due to plantar fasciitis after the vaccine or through January 2017. Tr. 187. Petitioner's foot pain was not a frequent topic of conversation; she is most acquainted with petitioner's left shoulder injury. Tr. 182.

Ms. Cannatelli still works with petitioner and petitioner still complains about her left shoulder, but not the way she did at the beginning. Tr. 175. She still helps petitioner with the charts, and they are always filed backwards when petitioner files them. Tr. 177, 182-83. According to Ms. Cannatelli, petitioner's need for assistance with the charts has "consistently stay (sic) the same, especially with those drawers that are too high or too low or if the chart is too thick…" Tr. 177. She did not need this level of assistance before October 2016. Tr. 177.

According to Ms. Cannatelli, petitioner now uses a cart for her files; she could not recall when that started, but there was no cart in the file room in 2016. Tr. 170. Ms. Cannatelli later stated petitioner started using the cart in 2020. Tr. 183.

Ms. Cannatelli could not say how long petitioner "suffered" or when she stopped having pain, but stated it still impacts her life. Tr. 184-85. Petitioner asked Ms. Cannatelli to be a witness in this case. Tr. 184.

**C.    Additional Evidence**

**1.    VAERS Report**

Petitioner filed two VAERS reports. Pet. Ex. 16; Pet. Ex. 18. Neither report is dated. Petitioner's Exhibit 18 was sent by fax to petitioner's counsel with a CDC cover letter dated March 1, 2019. Pet. Ex. 18 at 1. Both VAERS reports contain "SORENESS IN UPPER LEFT ARM FOLLOWING INJECTION AND BECOMING WORSE AND GRADUALLY MORE PAINFUL OVER MONTHS PAIN IS SO SEVERE THAT DRIVING, DRESSING AND LIFTING ARE RESTRICTED DUE TO PAIN." The vaccine listed is "flu shot". An "X" is placed by "Resulted in permanent disability". Pet. Ex. 16; Pet. Ex. 18 at 2. The only pre-existing medical condition specified was "arthritis of the knees". *Id.*

Petitioner filed a handwritten note dated June 10, 2019 which reads, "V.M. from -Chris Vacc. Adverse Event Reporting System – was it at Employee Health? Treating DR.?? 800 822 7967 # 895". Pet. Ex. 24. The author of the message was not provided.

Petitioner filed a letter from the Department of Health and Human Services dated June 13, 2019 acknowledging receipt of her VAERS report. Pet. Ex. 23. The same letter was filed again with a one-page attachment from Northwell Health containing vaccine details. The Northwell Health record indicates that it is page 2 of 5, but only one page was filed. Pet. Ex. 25.

**2.    Google Searches**

Petitioner submitted searched using Google dated March 28, 2017 and March 30, 2017 for "shoulder pain from flu shot", "arm injury from flu shot", and "flu shot injury to shoulder". Pet. Ex. 22 at 1-4. Petitioner also filed an undated National Vaccine Injury Compensation Program information sheet, and an April 2, 2017 search for "is there really a vaccine court". Pet. Ex. 22 at 5-7.

Another search conducted on September 19 was filed as Petitioner's Exhibit 26 for "how long it takes to find out if you have a decision at the vaccine court hearing". The year was not noted, and no other information was included.

A copy of the Vaccine Table was filed and designated as Petitioner's Exhibit 27, with a notation that it was "Downloaded from Google Search approximately June 2019-vacc." The document does not contain any information to verify when the search was done or what the search was that resulted in that document.

### III.   Legal Standards Regarding Fact Finding

Petitioner bears the burden of establishing her claims by a preponderance of the evidence. § 13(a)(1). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are generally considered to be trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). This presumption is based on the linked proposition that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in an accurate manner, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.,* No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), vacated on other grounds, *Sanchez by & through Sanchez v. Sec'y of Health & Human Servs.*, No. 2019-1753, 2020 WL 1685554 (Fed. Cir. Apr. 7, 2020), review denied, *Sanchez by & through Sanchez v. Sec'y of Health & Hum. Servs.*, 152 Fed. Cl. 782 (2021); *Cucuras v. Sec'y of Health & Human Servs.*, 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F. 2d. 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred"). In making contemporaneous reports, "accuracy has an extra premium" given that the "proper treatment hang[s] in the balance." *Id.* A patient's motivation for providing an accurate recount of symptoms is more immediate, as opposed to testimony offered after the events in question, which is considered inherently less reliable. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993); *see Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)). Contemporaneous medical records that are clear, consistent, and complete warrant substantial weight "as trustworthy evidence." *Cucuras*, 993 F.2d at 1528. Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Id.*

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as in cases where records are deemed to be incomplete or inaccurate. *See Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."). The Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount

to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be given. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is used to overcome the presumption of accuracy given to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *see, e.g.*, *Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Moreover, despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"). In short, "the record as a whole" must be considered. § 13(a).

## IV.    Discussion and Findings of Fact

### A.  Petitioner alleges that she suffered a SIRVA as the result of a flu vaccine she received on October 28, 2016.[31]

A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
> (ii) Pain occurs within the specified time frame [within 48 hours of vaccine administration];
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

---

[31] *See* Petition at 1.

42 C.F.R. § 100.3(c)(10).

A discussion of whether petitioner satisfies the criteria for SIRVA is premature at this point. The sole purpose for this hearing was to determine the onset of petitioner's alleged vaccine-related injury. Though onset is one of many hurdles petitioner faces in this matter, it is the only issue to be ruled upon here.

### B. Specific Findings of Fact as to Onset

To overcome the presumption that contemporaneous written records are complete and accurate, testimony must be "consistent, clear, cogent, and compelling." *See Sanchez*, No. 11-685V, 2013 WL 1880825, at *3. A determination of witness credibility must be made in assigning weight to their testimony. *See Andreu*, 569 F.3d at 1379.

I found the petitioner to be candid and credible as more specifically set forth below. Her witnesses, however, were well-rehearsed on the facts beneficial to petitioner but suffered precipitous decline in both information and memory as to all else.

Based on a careful review of the medical records, affidavits, and hearing testimony, I find the following facts supportable:

1. Petitioner received a flu vaccine on October 28, 2016 that felt "different." She did not have pain, just soreness, "hurtness", then weakness, an indication that something was different. Tr. 46, 67, 131-34.

2. On November 7, 2016, petitioner presented to Dr. Resnick with pain in her right foot, later determined by MRI to be a tear in the right plantar fascia. Petitioner suffered "severe pain" in her foot until about March 11, 2017, when she reported improvement of the plantar fasciitis to Dr. Resnick. She still had generalized pain in her feet. Pet. Ex. 20 at 5.

3. Between November 7, 2016 and March 11, 2017, petitioner attended 13 medical visits including physical therapy without mentioning any left arm or shoulder pain.

4. On April 10, 2017, petitioner presented for an annual employment health assessment and reported for the first time that she suffered an "arm injury since flu vaccine Oct '16." Pet. Ex. 2 at 58. She reported worsening pain. *Id*. at 13.

5. On April 18, 2017, petitioner presented to Dr. Sherman who had previously treated her for hip pain, pain in her knees and osteoporosis in 2015. Pet. Ex. 21 at 7, 10; Pet. Ex. 3 at 14, 15-20. Dr. Sherman conducted an examination on behalf of worker's compensation which revealed forward flexion and abduction of 170 degrees, external rotation of 60 degrees, and positive impingement sign. There was no AC joint tenderness or instability. There was 5/5 strength in all planes. His impression was "Right (sic) shoulder impingement syndrome." Pet. Ex. 21 at 7; Pet. Ex. 3 at 14. He

ordered physical therapy and Mobic with possible subacromial injection if symptoms persisted. *Id.*

6. Petitioner returned to Dr. Sherman on May 6, 2017 with continued "discomfort" but "somewhat better." She refused subacromial injection and was treated with Mobic. Pet. Ex. 21 at 8.

7. At her May 6, 2017 routine visit with Dr. Resnick for generalized foot pain, petitioner advised Dr. Resnick for the first time of a left shoulder flu shot reaction. Pet. Ex. 20 at 5.

8. Petitioner presented to physical therapy for her left arm/shoulder on May 16, 2017, one month after seeing Dr. Sherman, and reported left shoulder pain of 9/10. Her passive range of motion on abduction was now 102 degrees, a dramatic difference from the 170 degrees a month earlier. Pet. Ex. 5 at 4, 6.

9. Between May 16, 2017 and June 26, 2017, petitioner attended physical therapy nine times with complaints of pain radiating from her left shoulder into the upper arm and hand, pain at the deltoid, limitation of motion on abduction, and clicking of her left shoulder. Pet. Ex. 5 at 4. At her June 26, 2017 appointment, she mentioned difficulty dressing secondary to pain and range of motion of the left shoulder. *Id.* at 5. Petitioner did not complain of difficulty driving or attending to her duties at work.

10. At her June 26, 2017 visit with Dr. Kelly for hypertension and diffuse aching joint pain, petitioner reported aching left shoulder pain that was gradual in onset and moderately limiting her activities. She reported being unable to sleep on her left side due to left shoulder pain since her flu shot that was "getting worse". Pet. Ex. 6 at 25. She had tenderness of the glenohumeral joint, acromioclavicular joint, and bicipital groove on examination. There was crepitus and pain with abduction and adduction of the left shoulder. Pet. Ex. 6 at 27.

11. Petitioner underwent an MRI of the left shoulder on July 5, 2017, which revealed complete full thickness supraspinatus tendon tear with proximal tendon retraction to the level of the acromioclavicular joint with mild fatty replacement muscle; full thickness tear of the anterior two thirds of the infraspinatus with proximal tendon retraction to the level of the acromion; high grade partial thickness articular sided tear of the posterior third of the infraspinatus; and subscapularis tendinosis with superior articular sided fibers fraying. The findings were consistent with subacute/chronic Hill-Sachs impaction fracture deformity and bony Bankart Lesion. There was large glenohumeral joint effusion/synovitis with free communication to the subacromial bursa via the full thickness rotator cuff tears and acromioclavicular joint osteoarthritis. The findings were suggestive of long head of the biceps near full-thickness avulsion tear from the glenoid insertion with proximal tendon retraction into the mid to distal arm. Pet. Ex. 8 at 5.

12. Dr. Sherman discussed the MRI results with petitioner on July 19, 2017. His impression was an "irreparable rotator cuff tear." An injection was administered. Pet. Ex. 21 at 6.

13. Petitioner continued attending physical therapy in July and August 2017. Her pain was reduced to a reported 5/10 and her range of motion increased to 130 degrees. She continued to express difficulty with dressing, intermittent clicking of the left shoulder, and pain from her left shoulder into the upper arm and hand with left bicep strength of 3+/5. Pet. Ex. 5 at 5. Petitioner did not report any difficulty in driving or attending to her duties at work.

14. At a visit with Dr. Sherman on August 16, 2017, petitioner reported that she was "quite happy" and doing better since the shoulder injection. She had full range of motion and 4/5 strength on the left. She was to continue with rotator cuff scapular training and consider arthroscopy with debridement if her symptoms worsened. Pet. Ex. 21 at 5.

15. Petitioner returned to Dr. Sherman nine months later, on May 16, 2018, with increasing shoulder pain for several months and with sleep. She noticed noises in her shoulder. On examination, she had positive impingement, forward flexion of 180, abduction of 180 with 4/5 strength, internal rotation that lacked two spinal levels with 5/5 strength, and external rotation was 30 degrees with 3/5 strength. Dr. Sherman's impression was left shoulder rotator cuff insufficiency. A subacromial injection was given. Pet. Ex. 21 at 9.

16. Petitioner described her receipt of the October 28, 2016 flu vaccine as, "… soreness, a hurtness, a – you know, an indication that something was different." Tr. 43-44, 46. "Right after the flu shot, I had soreness… the weakness started maybe within a few days. The soreness continued and got more sore. I didn't pay much attention to it…But the weakness was – the weakness and the soreness was there…almost from the beginning, yeah." Tr. 65. "Maybe that day, the next day, that week…the weakness was starting, soreness and weakness until it progressed to the lack of mobility and severe pain which was months later". Tr. 67. Petitioner admitted it was not pain, but soreness and weakness that continued until the weakness prevented her from lifting her arm up to drive, though she could not recall when that began. Tr. 133-34. She conceded she had no concerns or need to call a doctor about her left arm until months later. Tr. 131-34.

17. The progression of her left arm/shoulder injury was gradual. Tr. 47-49. Between November 5, 2016 and March 11, 2017, the pain from her plantar fasciitis was incapacitating and made it difficult to walk. Tr. 52, 122-23; Pet. Ex. 9 at 1. During this time, she was unconcerned about about her left arm and "something, which I still thought was a flu shot reaction, but didn't pay much attention to it…but it was always there still, that left arm pain." Tr. 68-69. "I was not debilitated from the arm right after the flu shot. It was just in soreness and weakness." She was not concerned until some point in February or March. Tr. 131-32.

18. It was March 2017 when petitioner developed "pain" in her left arm and shoulder that caused difficulty in sleeping, driving, and attending to her daily activities. Tr. 62-63, 133-34. Then between March and July 2017, the severity of her shoulder pain increased and worsened over a short period of time, which was alarming and prompted her to seek medical care. Tr. 47-50, 59, 62, 126-27. Petitioner conceded it was at this point, she had pain, which she had not previously experienced in her left arm. Tr. 47-50, 58-59, 60-64, 67, 115-16, 125-27.

19. Petitioner did not recall where on her left arm she received the October 28, 2016 flu vaccine or where on her arm she had pain.

20. Petitioner's co-workers helped her prior to the October 28, 2016 flu vaccine due to the longstanding debility of her right hand, but she did not seek anyone's assistance at work, use a cart for her charts, or seek medical care until March or April 2017 when she developed severe arm pain. Tr. 62, 125, 127, 131-34. She was never "debilitated" by her left arm and is unsure where that term came from. Tr. 131.

21. Petitioner agreed that she had 13 visits with medical providers between November 5, 2016 and April 10, 2017 and did not mention any left arm/shoulder pain. Tr. 53-55, 115-16.

22. Petitioner first conducted Google searches on March 28, 2017, March 30, 2017, and April 2, 2017 on arm/shoulder injuries and flu vaccines and discovered the Vaccine Program, the Vaccine Court, and details about arm/shoulder injury associated with flu vaccine. Tr. 69-70; Pet. Ex. 22. She also downloaded and filled out a VAERS report she never filed but her attorneys filed. Tr. 75-76; Pet. Ex. 18 at 2.

23. Petitioner reported her left arm/shoulder injury at her annual work examination with Employee Health on April 10, 2017, because someone suggested she report it. Tr. 75; Pet. Ex. 1. She also asked for her vaccine record because she knew she would need proof of vaccination. Tr. 75.

24. Ms. Somma placed petitioner's onset of "extreme pain," inability to dress herself, drive, carry charts, or open doors as the date of the vaccine, October 28, 2016, and on October 31, 2016. Tr. 7-12, Pet. Ex. 12 at 1-2. Ms. Somma stated petitioner needed assistance with her charts for quite some time but did not recall petitioner having any difficulties with tasks prior to October 2016. Tr. 18.

25. Mr. Sinclair stated the onset of petitioner's pain was "immediately after receiving the vaccine" and he spoke to her about her severe discomfort and limited strength in her left arm, increasing pain, limited range of motion, difficulty driving, and need for assistance on October 31, 2016. Tr. 137-140, 153; Pet. Ex. 10 at 1. Mr. Sinclair recalled petitioner using a cart for her charts after that, in 2016, because she was struggling. Tr. 144-45. According to Mr. Sinclair, petitioner "complained for at least 6 months of shoulder pain with no improvement" and he assisted her during this time and until he

transferred to another unit in 2018. Tr. 159. He never had to assist her prior to October 2016. Tr. 147.

26. Ms. Cannatelli affirmed that petitioner's onset of pain was immediately upon receipt of the vaccine, that petitioner guarded her arm and was unable to raise her arm above her waist on the day of the vaccination. Pet. Ex. 11 at 1. Ms. Cannatelli discussed this with petitioner on both the day of the vaccine and on October 31, 2016. Tr. 164-65, 173. She assisted petitioner with charts prior to October 2016, but petitioner never struggled prior to October 2016. Tr. 168-69, 177, 180. According to Ms. Cannatelli, when days became weeks, she urged petitioner to go to the doctor and report the injury. Tr. 170-71, 183-84. Initially, Ms. Cannatelli stated that petitioner saw a doctor and brought in reports and scans but could not remember when that occurred. Tr. 171. She then "vaguely" remembered petitioner going to the doctor around Thanksgiving because she was getting worse. Tr. 174. Ms. Cannatelli then stated she asked if petitioner went to the doctor, but petitioner said no, so she just left it alone because they are only co-workers. Tr. 183-84.

27. Ms. Cannatelli then she saw petitioner daily between October 2016 and 2017, but only spoke to her briefly about twice a week until petitioner started to go to the doctor but could not recall when that was. Tr. 174-75. Ms. Cannatelli did not recall petitioner mentioning an onset of significantly worsening pain which prompted her to see a doctor or that she did not see a doctor for her left arm/shoulder until April of 2017. Tr. 186.

28. Petitioner's witnesses were less informed about her foot issues: Ms. Somma recalled petitioner having a foot problem at the same time as her shoulder causing her stress and affecting her work and life in general. Tr. 16-17, 20; Pet. Ex. 12 at 2. Mr. Sinclair believed petitioner's foot problem was after her shoulder injury, but she did not complain of pain, only moved slowly. Tr. 148. Once prompted by counsel he recalled her wearing a boot after October 2016 but could not recall if she was still wearing it when he left the unit in 2018. Tr. 157. Ms. Cannatelli stated petitioner had "some fasciitis" in September that pre-existed her vaccine and shoulder injury. Tr. 172, 187-88. She recalled that petitioner wore a boot for a while but stopped wearing it around the same time as the flu vaccine. Tr. 181-82. Ms. Cannatelli did not recall petitioner having difficulties walking after the vaccine and through January 2017 and added her foot was not a topic of conversation. Tr. 182, 187.

In reaching the foregoing conclusions, the affidavits and testimony of petitioner's witnesses as it relates to the onset of severe shoulder pain, inability to attend to her daily activities, and need for assistance on the day of and after her receipt of the October 28, 2016 flu vaccine, merits little weight as they do not corroborate and are grossly inconsistent with petitioner's own timeline. However, petitioner's witnesses did corroborate her claim that she felt something unusual after the receipt of her flu vaccine on October 28, 2016. With that exception, petitioner's affirmation and testimony, the affirmations and testimony of her witnesses, and the contemporaneous medical records are all in conflict.

The evidence filed in this case supports petitioner's receipt of a flu vaccine on October 28, 2016. Her first mention of a shoulder injury related to the receipt of her flu vaccine to any physician was five and half months after the vaccine, after she researched vaccine injuries and arm pain and after she sought extensive medical treatment for her foot, which she admitted caused severe pain and disability, while her arm was achy, sore, and getting weaker but caused no pain during that time. Petitioner did not use the word "pain" to describe her arm/shoulder in the months following the subject vaccination. Despite repeated attempts by her counsel to have her do so, she consistently confirmed only that she suffered from soreness and achiness with subsequent onset of weakness but no pain until around March 2017, when she experienced an abrupt and rapid onset of severe pain that required medical attention. Tr. 67, 131-33. Petitioner could not recall where on her arm the pain was but consistently pointed to the area between her elbow and shoulder. Tr. 92-93. An MRI confirmed a torn bicep. Tr. 89-90. Petitioner denied having pain until around March of 2017 and never mentioned a reduced range of motion of her left arm and shoulder. 42 C.F.R. § 100.3(c)(10)(iii).

Succinctly, petitioner denied that she suffered "debilitating" left arm pain rendering her unable to lift her left arm, dress, drive, carry charts require assistance or that of a chair or cart immediately upon receipt of and following her vaccination on October 28, 2016 as testified to by Ms. Somma, Mr. Sinclair, and Ms. Cannatelli. Tr. 131. While the witnesses' testimony is supportive of what petitioner experienced after March 2017, it contradicts petitioner's recital of the facts and undermines any reliability of their statements.

To her credit, petitioner did not attempt to change or challenge the record. She admitted that she did not seek any medical care for her arm following her flu vaccine because her arm was achy and sore and it did not affect her activities of daily living, though she gradually felt weakness between the elbow and shoulder. Tr. 58-59, 62-63. It was not until she suffered an abrupt onset of severe pain in March or April 2017 that disrupted her sleep and daily activities that she required medical care for her left arm. Tr. 50, 58-59, 131.

The focus of this ruling is only the onset of petitioner's alleged vaccine-related injury. Viewing the record as a whole and in petitioner's own words, she experienced an unusual feeling upon receipt of her flu vaccine on October 28, 2016 from which she "may have had" soreness, "hurtness", and the gradual onset of weakness of her arm. She had no pain or disability until sometime in March or April 2017, when she suffered a severe and abrupt onset of pain requiring medical attention. She consistently placed the location of that pain in the area between her elbow and shoulder, her bicep, which was shown to be ruptured on an MRI taken in July 2017.

Therefore, I find preponderant evidence to support petitioner's onset of pain and limitation of motion of the left arm/shoulder to be in March of 2017.

## V.    Conclusion

Upon detailed review of the record in its entirety, petitioner suffered an abrupt onset of severe pain in left arm/shoulder in March 2017, five and a half months after receipt of a flu vaccine on October 28, 2016.

Accordingly, the following is ORDERED:

**By no later than <u>Thursday, December 15, 2022</u>, petitioner shall file a status report indicating how she intends to proceed.** Alternatively, petitioner shall file a motion to dismiss, a joint stipulation for dismissal, or a Motion for a ruling on the record, all of which will result in the dismissal of her claim.

**IT IS SO ORDERED.**

<u>**s/Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master